Schuckl & Co., Inc. (a Corporation) v. Commissioner.
Schuckl & Co. v. Commissioner
Docket No. 19868.
United States Tax Court
1949 Tax Ct. Memo LEXIS 17; 8 T.C.M. (CCH) 1047; T.C.M. (RIA) 49290; December 9, 1949
*17 1. Salaries and bonuses paid to petitioner's president and vice president, held, reasonable under the provisions of section 23(a)(1)(A), I.R.C.
2. Additional hauling charges paid in 1942 for services performed by trucker in 1939 and 1940 for petitioner on an accrual basis, held, not deductible in 1942. Philip S. Mathews, Esq., and Lloyd S. Ackerman, Esq., for the petitioner. W. J. McFarland, Esq., for the respondent. VAN FOSSAN Memorandum Findings of Fact and Opinion The respondent determined deficiencies in the petitioner's tax liability as follows: Fiscal Year
Ended the
Last Day
Character of Taxes
Amounts
of February
Determined
1942
Income
$ 661.04
Excess Profits
1,744.68
1943
Declared Value Excess Profits
2,217.05
Excess Profits
25,413.47
1944
Excess Profits
5,232.11
Total
$35,268.35
*18 The questions involved are: 1. Whether or not the compensation paid by the petitioner to its president and vice president during the fiscal years ending February 28, 1943, and February 29, 1944, was reasonable, and, 2. Whether or not certain additional hauling charges paid by the petitioner in the fiscal year ending February 28, 1942, relating to services performed in the petitioner's fiscal year ending February 29, 1940, constituted a proper deduction from gross income in the year in which they were paid. Findings of Fact Certain facts were stipulated. As so stipulated, they are incorporated in our findings of fact by this reference. The portions thereof pertinent to the issues are as follows: The petitioner is a corporation organized under the laws of California in 1923. Its principal office and place of business are located at Sunnyvale, California. The petitioner is engaged in the business of buying green fruits and vegetables, processing and canning such foods, and selling the produce at wholesale. It has two plants - one at Sunnyvale, California, and one at Niles, California. At February 28, 1942, the petitioner had 4,903 shares of capital stock outstanding of the *19 par value of $100 each. From March 1, 1941, to April 18, 1942, the petitioner had 21 stockholders whose holdings aggregated 4,903 shares and whose names and the number of their respective shares were as follows: Number
Name
of Shares
Schmidt & Co.
1,900    L. S. Ackerman
857 1/2
Florence A. Sears
577 1/2
Therese E. Schuckl, Life Tenant
444 1/2
Emil Rutz
277    Paul W. Case
126    Therese A. Schuckl
194 1/2
B. Martin
100    A. F. Pfeiffer
80    G. D. Clement
70    W. E. Jones
70    Harry B. Wickliffe
55    Leonard N. Bakke
50    Louis Traung
25    Louis Traung and Wells Fargo Bank &
Union Trust Company, Trustees under
the last will and testament of Charles
G. Traung, Deceased
25    J. H. Brunner
25    Emil Rutz, Trustee
6    H. Cali & Bro.
5    Josephine Clement
5    W. H. Hughes, Jr.
5    John Stenson
5    Total
4,903     The only changes in shareholdings in the period April 18, 1942, to February 29, 1944, were as follows: Shares
4-18-42
Louis Traung and Wells Fargo
Bank & Union Trust Company to
Emil Rutz
13
4-18-42
Louis Traung and Wells Fargo
Bank & Union Trust Company to
Paul W. Case
12
10-13-42
A. F. Pfeiffer to Emil Rutz
40
10-13-42
A. F. Pfeiffer to Paul W. Case
40
8-23-43
Emil Rutz, Trustee, to Amos and
Linda Swayne
6
*20 During the taxable years the petitioner's Board of Directors consisted of Emil Rutz, President; Paul W. Case, Executive Vice President; G. D. Clement, Secretary; H. B. Wickliffe, Treasurer and Assistant Secretary; and Lloyd S. Ackerman. At a meeting of the Board of Directors held December 11 and December 12, 1941, the following resolutions were adopted: "RESOLVED, That the following bonuses be paid to officers, designated employees and other employees: Mr. E. Rutz, President
$15,000.00
Mr. P. W. Case, Vice-President
10,000.00
Department Heads: Amos C. Swayne
3,000.00
H. B. Wickliffe
1,500.00
G. D. Clement
1,000.00
Leonard N. Bakke
1,000.00
L. S. Ackerman, Jr.
500.00
A. H. Pfeiffer
500.00
Ted C. Gruhler
500.00
Other regular employees in service for
one year, one month's salary
9,000.00
Total
$42,000.00
"FURTHER RESOLVED, That said bonuses shall be payable prior to December 31, 1941. "FORMULA FOR DETERMINATION OF BONUS IN FUTURE YEARS "The directors discussed the adoption of a formula for determination of payment of bonuses for future years. It was the sense of the meeting that it would be unnecessary to determine bonuses for department *21 heads and other employees, since determination can be made by the board from year to year as circumstances warrant, but it was thought desirable to determine a formula for fixing the bonus compensation of the executive officers. The following resolution was M S and U C: "RESOLVED, That effective for the fiscal year ending February 28, 1943, and annually thereafter until the further order of the board of directors, the corporation shall pay to Emil Rutz, president, and to Paul W. Case, vice-president, 10% of the net profits of the corporation after deducting all expenses, bonuses, additional compensation to employees, and taxes, except income taxes. The division of said percentage of the net profits between Mr. Rutz and Mr. Case shall be determined each year by the board of directors. The amount payable to Messrs. Rutz and Case by virtue of this paragraph shall not however be regarded as an expense in determining the amount of net profits subject to the bonus compensation. Income tax as herein used includes all taxes that have been or may be levied from time to time by the United States Government, measured by or based in any way on net income, including any taxes on excess profits *22 or on undistributed earnings. "FURTHER RESOLVED, Provided, however, that such payment in each year shall be subject to two conditions: "1st. If the corporation shall sustain a loss in any year after February 28, 1942, the net loss for such year shall be deducted from the profit before taxes for the year then current before computing bonus compensation. "2nd. No bonus shall be paid in any year unless stockholders shall have received an average of $6.00 per share per annum in dividends commencing March 1, 1942. "FURTHER RESOLVED, That bonuses payable to department heads and employees in service for longer than one year shall be determined by the board of directors annually." On February 18, 1942, the petitioner mailed to each stockholder of record of that date a notice in the following form: "The Annual Meeting of the Stockholders of SCHUCKL & CO., INC. will be held at the office of the company in the State of California, City and County of San Francisco, No. 260 California Street, on Monday, the 9th day of March, 1942, at 2:30 o'clock in the afternoon for the election of directors and the transaction of such other business as may properly come before such meeting. "Enclosed *23 herewith is a copy of a resolution of the Board of Directors of the Company adopted at its meeting held on December 12, 1941, relating to bonus compensation of officers. Your attention is directed to the fact that Messrs. Rutz and Case, who are beneficiaries of the bonus resolution, constitute a majority of the Board of Directors of the Corporation. "The enclosed resolution will be submitted at the Stockholders' Meeting for approval or ratification by the Stockholders. "Please execute and return the enclosed proxy as soon as possible unless you intend to be present at the meeting in person." A meeting of the stockholders of the petitioner was held on March 9, 1942. The minutes of this meeting are as follows: "MINUTES OF ANNUAL MEETING OF STOCKHOLDERS OF SCHUCKL & CO., INC., HELD AT THE OFFICE OF THE CORPORATION, 260 CALIFORNIA STREET, SAN FRANCISCO, CALIFORNIA, MARCH 9, 1942, AT 2:30 P.M. "All of the stockholders were present in person or by proxy with the exception of the following: Schmidt & Company
1,900 shares
Louis Traung and Wells Fargo Bank
& Union Trust Co., Trustees under
last Will & Testament of Charles
F. Traung, deceased
25 shares
1,925 shares
*24 "The stockholders present in person were: L. S. Ackerman
857 1/2
shares
Emil Rutz
277
shares
Emil Rutz, Trustee
6
shares
Paul W. Case
126
shares
Harry B. Wickliffe
55
shares
John Stenson
5
shares
1,326 1/2
shares
"Those present by proxy were as follows: Name of
Stockholder
No. Shares
Proxy
Mrs. Therese E. Schuckl,
Life Tenant
444 1/2
H. B. Wickliffe
Mrs. Therese E. Schuckl
194 1/2
H. B. Wickliffe
Mrs. Florence A. Sears
577 1/2
H. B. Wickliffe
Leonard N. Bakke
50
H. B. Wickliffe
Miss J. H. Brunner
25
H. B. Wickliffe
R. Cali & Bro.
5
H. B. Wickliffe
G. D. Clement
70
H. B. Wickliffe
Mrs. Josephine Clement
5
H. B. Wickliffe
W. H. Hughes, Jr.
5
H. B. Wickliffe
W. E. Jones
70
H. B. Wickliffe
B. Martin
100
H. B. Wickliffe
A. F. Pfeiffer
80
H. B. Wickliffe
Louis Traung
25
H. B. Wickliffe
1,651 1/2
"The meeting was called to order by the President. The minutes of the previous annual meeting were read and approved. "The minutes of the meeting of the Board of Directors held *25 during the year were read and approved. Mr. Rutz then discussed the resolution passed by the Board of Directors on December 12, 1941, a copy of which was mailed to all stockholders together with the notice for the annual meeting, regarding the bonus to Messrs. Rutz and Case to become effective during the fiscal year 1942, and to remain in force thereafter until further action by the Board of Directors. Upon motion of Mr. Wickliffe, seconded by Mr. Stenson, the following resolution of the Board of Directors was unanimously ratified, confirmed and approved: "RESOLVED, That effective for the fiscal year ending February 28, 1943, and annually thereafter until the further order of the Board of Directors, the corporation shall pay to Emil Rutz, president, and to Paul W. Case, vice-president, 10% of the net profits of the corporation after deducting all expenses, bonuses, additional compensation to employees, and taxes, except income taxes. The division of said percentage of the net profits between Mr. Rutz and Mr. Case shall be determined each year by the Board of Directors. The amount payable to Messrs. Rutz and Case by virtue of this paragraph shall not however be regarded as an expense *26 in determining the amount of net profits subject to the bonus compensation. Income tax as herein used includes all taxes that have been or may be levied from time to time by the United States Government, measured by or based in any way on net income, including any taxes on excess profits or on undistributed earnings. "FURTHER RESOLVED, Provided, however, that such payment in each year shall be subject to two conditions: "1st. If the corporation shall sustain a loss in any year after February 28, 1942 the net loss for such year shall be deducted from the profit before taxes for the year then current before computing bonus compensation. "2nd. No bonus shall be paid in any year unless stockholders shall have received an average of $6.00 per share per annum in dividends commencing March 1, 1942. "Upon motion of Mr. Wickliffe, seconded by Mr. Stenson, the acts of the Board of Directors during the past year were unanimously approved. "The next business to come before the meeting was the election of Directors for the ensuing year. "The President declared nominations open. Mr. Stenson nominated the incumbent Directors. There being no further nominations, upon motion of Mr. Wickliffe, *27 seconded by Mr. Stenson, it was moved that nominations be closed. "Upon motion of Mr. Stenson, seconded by Mr. Wickliffe, it was unanimously "RESOLVED, That the Secretary of the Corporation be instructed to cast the unanimous ballot of the stockholders present for Messrs. Emil Rutz, Paul W. Case and L. S. Ackerman, Sr., as Directors of the Corporation. "Thereupon the Chairman declared Messrs. Rutz, Case and Ackerman duly elected and qualified as Directors for the ensuing fiscal year, and until their successors have been elected and qualified. "The Directors gave the following addresses for notification of meetings and other matters as required by the bylaws of the Corporation: "Mr. Lloyd S. Ackerman, Sr., 111 Sutter Street, San Francisco. "Mr. Emil Rutz, 260 California Street, San Francisco. "Mr. Paul W. Case, 260 California Street, San Francisco. "There being no further business to come before the meeting, upon motion the meeting adjourned. "(Sgd.) H. B. Wickliffe "Assistant Secretary" On June 24, 1943, an agreement was made by the petitioner, Emil Rutz, and Paul W. Case. The agreement follows: "THIS AGREEMENT made and entered into this twenty-fourth day of *28 June, 1943, by and between SCHUCKL & Co., INC., 'First Party', EMIL RUTZ, 'Second Party', and PAUL W. CASE, 'Third Party', WITNESSETH: "That in consideration of the payment by First Party to Second Party of the sum of Forty Nine Thousand Five Hundred Fifty-Five and 51/100 dollars ($49,555.51) and to Third Party of the sum of Thirty Three Thousand Thirty-Seven and 01/100 Dollars ($33,037.01) as bonus for the fiscal year ending February 28, 1943, in accordance with the provisions of the resolution passes [sic] by the Board of Directors of said First Party on December 12, 1941 and ratified by the stockholders of said First Party at the annual meeting held March 9, 1942, Second Party and Third Party, each for himself, agrees that in the event "a) First Party's sales to the United States Government during the fiscal year ending February 28, 1943 shall be renegotiated pursuant to the Act of April 28, 1943 of the Congress of the United States, and in consequence thereof it shall be determined that the selling price of goods sold by First Party to the United States must be reduced, or "b) First Party shall be disallowed deduction from its gross income for the fiscal year ending *29 February 28, 1943 (under Section 23a of the Internal Revenue Code), of the full amount of bonuses paid to Second Party and Third Party, "then and upon the occurence of either or both said events, Second Party and Third Party shall repay to First Party such part of the bonus paid to them respectively as hereinafter provided. If it shall be determined through renegotiation that the selling price of goods sold by First Party to the United States is reduced, Second Party shall repay to First Party six (6%) per cent of the consequent reduction in net profit of First Party before taxes and Third Party shall repay to First Party, four (4%) per cent thereof. If any part of the bonuses paid by First Party to Second Party or Third Party are disallowed by the Bureau of Internal Revenue as deductions for income tax purposes under section 23a of the Internal Revenue Code, Second Party and Third Party respectively agree to repay First Party an amount equal to the amount which is paid by said First Party as an additional tax by reason of the disallowance of said bonuses. Said Second Party agrees to repay to said First Party sixty (60%) per cent of said *30 amount and said Third Party forty (40%) per cent thereof. "It is further agreed between said First, Second, and Third Parties that this agreement applies exclusively to the bonuses earned by and paid to said Second Party and Third Party for the fiscal year ending February 28, 1943 and does not affect the unconditional right of said Second Party and Third Party to the payment of the annual bonus provided for in the resolution passed by said Board of Directors on December 12, 1941 and ratified by the stockholders of said First Party at the annual meeting held March 9, 1942. "IN WITNESS WHEREOF, First Party has caused these presents to be executed by its President and Secretary and Second Party and Third Party have hereunto set their hands the day and year first hereinabove written. "SCHUCKL & CO., INC. "By: Emil Rutz "(president) "G. D. Clement "(secretary) "Emil Rutz "(EMIL RUTZ) "Paul W. Case "(PAUL W. CASE)" The amounts of salary and bonus paid by petitioner to Rutz and Case from the fiscal year ending February 28, 1935 to the fiscal year ending February 29, 1944, inclusive, are as follows: EMIL RUTZ
PAUL W. CASE
Date Paid
Salary
Bonus
Salary
Bonus
3/1/34-2/28/35
$ 6,750.00
$ $ $ 3/1/35-2/29/36
7,200.00
3/1/36-2/28/37
7,500.00
300.00
1,400.00
3/1/37-2/28/38
10,500.00
940.00
8,800.00
525.00
3/1/38-2/28/39
15,300.00
417.00
10,900.00
300.00
3/1/39-2/29/40
17,340.00
2,800.00
11,700.00
1,900.00
3/1/40-2/28/41
20,000.00
13,200.00
3/1/41-2/28/42
20,000.00
15,833.00
13,200.00
10,550.00
3/1/42-2/28/43
20,000.00
49,555.51
13,200.00
33,037.02
3/1/43-2/29/44
20,000.00
31,698.52
13,200.00
21,132.35
*31 The following table compiled from the accounting records of the petitioner, compares the annual production, sales, and profits: Net Profit
(or loss)
Fiscal
Before Fed.
Year
Cases
Income &
Ended
Packed
Sales
E.P. Taxes
2/29/24
65,000
$ 469,656.70
$ (7,558.85)
2/28/25
137,448
798,820.26
8,235.30
2/27/26
332,376
1,458,701.50
37,959.01
2/28/27
407,538
1,528,553.56
98,567.64
2/29/28
325,204
1,296,335.89
11,357.52
2/28/29
533,851
2,293,402.33
124,543.96
2/28/30
565,146
2,496,822.97
15,141.18
2/28/31
611,567
2,092,262.22
75,125.52
2/29/32
939,613
2,076,033.91
(69,466.63)
2/28/33
1,075,503
2,010,900.88
(125,121.57)
2/28/34
1,158,990
2,675,255.26
109,018.83
2/28/35
902,711
2,485,667.07
(159,989.81)
2/29/36
935,609
3,169,458.59
(66,060.22)
2/28/37
1,062,401
2,835,533.06
192,686.08
2/28/38
1,503,255
3,910,194.73
138,400.18
2/28/39
1,544,122
4,439,190.56
65,908.63
2/29/40
1,787,866
5,242,963.48
110,138.12
2/28/41
1,663,463
3,311,160.52
(156,651.97)
2/28/42
2,059,837
6,189,670.67
459,250.27
2/28/43
2,119,562
8,895,355.03
* 743,332.72
2/29/44
2,510,362
9,104,578.53
* 538,043.08
*32 Div-
Net Profit
Shares
dend
Fiscal
(or Loss)
Out-
Paid
Year
After
standing
Per
Ended
Taxes
($100 Par)
Share
2/29/24
$ (7,558.85
1,000
2/28/25
8,235.30
1,000
2/27/26
32,992.71
1,430
2/28/27
87,947.51
1,970
2/29/28
9,389.98
2,075
$ 6.00
2/28/29
112,141.49
2,218
7.00
2/28/30
14,231.34
2,735
8.00
2/28/31
64,055.97
3,000
8.00
2/29/32
(69,466.63)
3,000
4.00
2/28/33
(125,121.57
3,000
2/28/34
86,518.83
3,000
2/28/35
(159,989.81)
4,903
2/29/36
(66,060.22)
4,903
2/28/37
150,686.08
4,903
2/28/38
114,400.18
4,903
3.00
2/28/39
63,308.63
4,903
0.75
2/29/40
84,738.12
4,903
4.50
2/28/41
(156,651.97)
4,903
2.75
2/28/42
332,179.14
4.903
6.00
2/28/43
200,791.14
4,898
8.75
2/29/44
166,072.68
4,898
10.00
Net profit per books after renegotiation in the year ending February 28, 1943 was $683,332.72 and for the year ending February 29, 1944 was $450,863.08. Net profit per tax returns before renegotiation was $749,338.10 for the year ending February 28, 1943 and $536,472.42 for the year ending February 29, 1944. Net profit per tax returns *33 after renegotiation was $689,338.10 for the year ending February 28, 1943 and $449,292.42 for the year ending February 29, 1944. The sales by the petitioner to the United States Government in the years under consideration, in their relation to the total sales, are as follows: Fiscal Year
Cases
Dollars
1940-1941
Total Sales
1,238,809
$3,311,161
U.S. Government
105,669
8 1/2%
1941-1942
Total Sales
2,042,880
6,167,372
U.S. Government
425,683
1,255,550
21%
20%
1942-1943
Total Sales
2,547,342
* 8,881,269
U.S. Government
736,344
2,702,158
29%
30%
1943-1944
Total Sales
2,416,141
* 9,258,244
U.S. Government
731,276
3,329,779
30%
36%
1944-1945
Total Sales
3,222,358
* 12,016,149
U.S. Government
1,158,888
5,554,722
36%
46%
The record discloses additional facts, as follows: From the time of its organization in 1923, until his death in September, 1937, Schuckl was the petitioner's president. Rutz became associated with petitioner in July, 1923, as office manager. He became *34 treasurer in 1930 and vice president in 1931. Schuckl died in September, 1937, and Rutz then became the petitioner's president and continued in this position during the taxable years. Rutz has been active in various trade groups since 1942. He has been director of the Canners League of California, a trade association of California canners. In 1944 and 1945 he was president of the California Processors and Growers, an association of California canners organized to represent its members in labor negotiations with the Cannery Workers Unions. In 1947 he was president of the National Canners Association, a trade association comprised of about 80 to 90 per cent of all the canners in the United States. In January, 1937, Case was employed by petitioner as sales manager and when Schuckl died in September, 1937, Case became vice president and, as second in command, assisted Rutz who was then in active charge of the business. Case was experienced in the food business before being employed by petitioner. He had been west coast buyer for the Kroger Grocery Company. Prior to that, he worked in the main office of that company in Cincinnati, Ohio. Until 1937, petitioner's business consisted of *35 about 95 per cent export sales. Orders were solicited abroad and filled by petitioner during the next packing season. In 1937 petitioner adopted the policy of concentrating more on its domestic business. The responsibility for this promotional work fell largely on Case as sales manager. The total number of cases packed by petitioner in the fiscal year ending February 29, 1940, was an increase of 70 per cent over the number packed in 1937 and the domestic business had increased to 35 per cent of the total. The canning business is a competitive one with many risks. The canner must gauge the market for his product, buy the raw foods and pack them with this market in mind. If there is an over-production of the crop, the canner runs the risk of having the price of that canned article depressed below his profitable production figure. If the crop is short, the canner must compete with other canners in bidding for it and, in turn, is faced with the possibility of having his customers refuse to buy at the resulting high price. Petitioner, under the management of Rutz and Case, diversified its products resulting in lower unit cost of product and spreading the speculative risk over a greater *36 number of items. This greater diversification also enabled petitioner to maintain a more constant labor force. In March, 1940, Great Britain declared an embargo on the import of all canned fruits and vegetables. This represented a loss to petitioner of what had been 65 per cent of its business. This loss of the foreign market depressed the domestic market in canned goods. Petitioner reduced its pack but was unable to sell it all with the result that it sustained a loss of $165,000 in the fiscal year ending February 28, 1941, with a large carry-over of unsold stocks into the next year. In the calendar years 1940 and 1941, all sales made by the petitioner to the United States Government were on a competitive bid basis and in a period when the market for canned foods was depressed and highly competitive. It was not until the 1942 season that Government purchases were made on the basis of "set-aside orders". Beginning in the year 1942, economic conditions due to the war were such that a seller's market prevailed in the canning business. This change in market conditions relieved the petitioner of some of its merchandising problems but left it caught between rising production costs and *37 the more slowly moving price ceilings imposed by the Office of Price Administration. Production during these war years involved many serious labor problems. Petitioner was successful in overcoming these difficulties and was regarded as an efficient and progressive operator. The annual bonuses to the petitioner's officers had been the subject of periodic bargaining between Ackerman, as representative of the stockholders, and Rutz and Case. The parties concerned were anxious to eliminate the necessity to haggle annually over the bonuses and reached a compromise whereby the petitioner would pay a bonus of 10 per cent of net profits before taxes to Rutz and Case, to be divided between them as determined by the Board of Directors. The petitioner's bank, American Trust Company, had knowledge of the bonus compensation plans. The petitioner maintained a line of credit with its bank of about $1,700,000. The executive vice president of the bank, with whom Rutz, as petitioner's president, had dealings, had no objections to the petitioner's bonus plan. Rutz always notified the executive vice president of the bank prior to any bonus being declared. The fiscal annual salaries of $20,000 and *38 $13,200 paid to Rutz and Case, respectively, in the taxable years were relatively lower than salaries concurrently paid to similar executives in the industry. The bonus compensation of 10 per cent of the net profits was not in excess of the rate generally accepted as reasonable in the industry for that type of compensation. In June, 1944, Case resigned his position with petitioner, as did Amos Swayne, the general superintendent, and Case and Swayne went into the canning business together. The following table shows the compensation paid to Rutz and Case during the taxable years and the amounts allowed by the respondent: Year Ending
Year Ending
February 28, 1943
February 29, 1944
Amount
Amount
Payments
Amount
Allowed by
Amount
Allowed by
Name
of
Paid
Respondent
Paid
Respondent
Emil Rutz
Salary
$20,000.00
$20,000.00
$48,629.18
$48,629.18
Bonus
49,555.52
31,698.52
Paul W. Case
Salary
13,200.00
13,200.00
$32,286.12
$32,286.12
Bonus
33,037.01
21,132.35
Totals
$115,792.53
$80,915.30
$86,030.87
$80,915.30 Respondent disallowed the aggregate of $34,877.23 for the year ending *39 February 28, 1943 and $5,115.57 for the year ending February 29, 1944 and accordingly increased the petitioner's income by the same amounts. From time to time in the period August 1, 1939, to February 28, 1941, the petitioner shipped canned goods by truck from its plant in Sunnyvale, California, to the Port of Redwood City and its plant at Niles, both in California. These trucking services were rendered for the petitioner by R. Cali & Brothers, hereinafter called Cali, a partnership licensed as motor carriers by the Interstate Commerce Commission and the Railroad Commission of the State of California (subsequently, the Public Utilities Commission). By the latter they were licensed as Radial Highway Common and Highway Contract Carriers under the Highway Carriers Act of 1935 of the State of California in the period December, 1935, to December 20, 1943. The petitioner was billed for these services by Cali at the rate of three and threefourths cents per hundred pounds for the hauling to the Port of Redwood City and at a rate of five cents per hundred pounds for hauling to Niles. The petitioner paid these charges on invoices rendered in said periods. During the petitioner's fiscal *40 year ending February, 1942, an auditor for the California Railroad Commission analyzed Cali's rate schedules and determined that the services Cali rendered to petitioner were intrastate shipments and not interstate shipments, as believed by Cali, and that Cali should have charged petitioner at the rate of six cents per hundred pounds. [1] On the basis of this determination and a ruling from the Railroad Commission, Cali billed the petitioner in February, 1942, for the following additional sums: Difference
Amount
Redwood City
Weight
in Rate
2/29/40
2/28/41
2/29/40
12,483,248
.0225
$2,808.73 $ 2/28/41
11,568,858
.0225
2,602.99
Niles
2/29/40
5,059,238
.01  505.92
2/28/41
2,607,041
.01  260.70
$3,314.65
$2,863.69 Petitioner paid this additional charge in February, 1942, and claimed it as a deduction *41 in the fiscal year ending February 28, 1942. The respondent disallowed this deduction contending that these additional hauling charges accrued in the years to which they related in the amount of $3,314.66 in the year ending February 29, 1940, and $2,863.69 in the year ending February 28, 1941. The petitioner conducts its business on a fiscal year basis, the year ending the last day of February, and its books are kept on an accrual system of accounting. Opinion VAN FOSSAN, Judge: The first question to be considered is whether or not the compensation paid by petitioner to its president and vice president was reasonable. The compensation to be considered is that paid during petitioner's fiscal years ending in February, 1943, and February, 1944. As a general rule, when the respondent determines that the compensation paid to employees is in excess of "a reasonable allowance for salaries or other compensation for personal service actually rendered" he makes out a prima facie case. The burden is then upon the petitioner to defend its action. There are two obstacles in petitioner's path which he must overcome successfully to defend the compensation paid. If the compensation is contingent *42 it must be paid pursuant to a "free bargain" between the employer and the employee, and, secondly, the compensation in any event must be "reasonable under all circumstances" existing when the contract was made. [2] The problem has been before this Court many times. There has evolved out of these many cases no one test which can be applied in determining the reasonableness of the compensation. It is a question of fact to be determined in each case. Rutz and Case, whose compensation is in question, owned between them approximately 10 per cent of the 4,903 shares of petitioner's stock outstanding and held by 21 stockholders. This, and the fact that the shareholders were guaranteed dividends of six per cent as a condition precedent to the payment of bonuses, tend to refute any contention that the compensation in question was a distribution of stock earnings as salary and bonus in lieu of dividends. The evidence supports fairly petitioner's view that the compensation plan was entered into as the result of a free bargain between the petitioner on the one hand and Rutz and Case on the other. Although Rutz and Case comprised a majority *43 of the members of the Board present at the meeting at which the bonus plan was adopted and under which the amounts in question were paid, the plan itself was a compromise between Rutz and Case on one side and the representative of the stockholders on the other. The stockholders were notified of the plan and they ratified it unanimously at their next meeting. The petitioner offered testimony to show that the salaries and bonuses paid to Rutz and Case were comparable to those paid to other executives in the industry. The respondent offered no evidence to contradict or impeach the testimony of petitioner's witnesses or to show in any way that the compensation was unreasonable to any extent. It is our opinion that the petitioner has shown the salary and bonus agreement was reasonable when made. Rutz had been with the petitioner since it was formed and had been managing the business as its president for four years before the date of the agreement. Case had been vice president and second in command for four years. Under their management the business was successful. Rutz and Case were active in various trade organizations and had sound reputations in the industry for operating an efficient *44 and aggressive business. Their demands for a larger share of earnings were met with a compromise and ended in an agreement made in 1941 when there was a larger net profit in view. "It would not seem to be an unreasonable business practice for an employer to recognize and reward sacrifices made by employees in the hard, formative days by granting a more generous compensation in the days that are lush." Commercial Iron Works v. Commissioner, 166 Fed. (2d) 221. Therefore, the reasonableness of compensation, tested by the circumstances existing both at the time it was agreed to and the time it was paid, can be determined by the fact that the employees whose compensation is in question were proven men and that it was "good business" to pay them a share of the profits based on what they had contributed to and were responsible for in the development of the business. In his brief the respondent emphasizes the sales by the petitioner to the Government. The proportion of the petitioner's sales to the Government during the taxable years was 21 per cent of the pack volume in the fiscal year ending February 28, 1942, 29 per cent, 30 per cent, and 36 per cent, respectively, for the *45 following years. This does not indicate that the petitioner was dependent on its sales to the Government for survival. Rutz testified that during the war years the petitioner had no selling problems but that it was beset by production difficulties in having to compete for a labor supply with local industries paying higher wages and also to operate profitably when costs of production were rising faster than the price ceilings imposed by law. The compensation paid a business executive is not unreasonable merely because he sheds some of the problems of selling only to incur additional problems of production. It is our conclusion upon consideration of all the evidence that the compensation paid by petitioner to Rutz and Case was reasonable under the circumstances existing both at the date of the agreement to pay and at the time the payment was made. The next question to be considered is the hauling charge. The sum of $2,863.69 paid in February, 1942, as additional charge for hauling done in the fiscal year ending February 28, 1941, is not at issue having been included in petitioner's loss carry-over for the fiscal year in which paid. There remains for our consideration the additional *46 charge of $3,314.65 paid by petitioner in 1942 for services performed in the fiscal year ending February 29, 1940. As for the other facts on this issue there is no controversy. The question before us is whether or not additional haulage charges constitute a proper deduction from gross income of the taxpayer on an accrual basis in the year in which such charges are paid where the charges are for services performed (but not accrued on petitioner's books) in a prior year. The rates were regulated by public authority who on later audit determined that the classification and rate as billed by the carrier and paid by the taxpayer were incorrect. In the present instance the underpayment was primarily due to error by the carrier in failing correctly to classify the haulage as intra-state business. Petitioner, the shipper, paid the amount as billed. There was no dispute between the parties over the fact of liability nor over the amount due, nor was there any contingency as to liability postponing payment. The liability was fixed by law. All the factors fixing the liability had occurred in the prior year. Cf. Security Flour Mills Co. v. Commissioner, 321 U.S. 281. We cannot *47 accede to petitioner's statement on brief that "the mutual mistake of the parties had the same effect as a 'contest' in postponing the establishment of the fact of liability and the amount thereof." Petitioner was on an accrual system of accounting. The amount paid was a proper accrual in the prior year and no deduction of the same may be had in the later year of payment. So to do will distort income. Standard Paving Company, et al., 13 T.C. - (No. 60). Decision will be entered under Rule 50. Footnotes
*. Net profit per books before renegotiation.↩
*. Total sales figures shown are as determined on renegotiation reports except for year ended February 28, 1941.↩
1. The confusion over the correct rates was confounded by a letter introduced in evidence from the Public Utilities Commission of the State of California (which succeeded to the duties of the Railroad Commission) to the effect that the correct rate during the period in question was 6 1/2 cents per hundred pounds.↩
2. Regulations 111, Section 29.23(a)-6(2), (3).↩